UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DIANE ADOMA,

            Plaintiff,

     v.

THE UNIVERSITY OF PHOENIX,
INC., et al.,

            Defendants.

_____/

NO. CIV. S-10-0059 LKK/GGH

O R D E R

     Plaintiffs seek class certification on state law wage and hour claims.  On August 13, 2010, the court declined to exercise jurisdiction over plaintiffs' federal Fair Labor Standards Act claims, pursuant to the first-to-file rule and a case proceeding in the Eastern District of Pennsylvania.  (Dkt. No. 70).  Because that order disposed of all federal claims and the complaint only asserted supplemental jurisdiction as a basis for jurisdiction over state law claims, the court ordered supplemental briefing regarding subject matter jurisdiction.

////

1    For the reasons stated below, the court concludes that it has
2 jurisdiction over plaintiffs' state law claims under the Class
3 Action Fairness Act, 28 U.S.C. § 1332(d). Plaintiffs' motion for
4 class certification under Fed. R. Civ. P. 23(b)(3) is granted.

5                            **I. Background[1]**

6    Defendant University of Phoenix ("UOP") is a private,
7 for-profit educational institution that offers classes at 362
8 independent campuses throughout the United States, and through
9 online programs. Defendant Apollo Group, Inc. is the parent
10 company of UOP and handled all of the administrative functions
11 relating to payroll.

12    Plaintiffs Adoma and Abbaszadeh worked as Enrollment
13 Counselors for one or both defendants. Plaintiffs allege that
14 defendants maintained two computer systems regarding Enrollment
15 Counselors' work. One system tracked the Counselors' availability
16 for taking calls and another that was used to track overtime hours
17 worked. Plaintiffs' primary claim is that the former system may
18 be used to demonstrate that Enrollment Counselors worked overtime
19 not recorded by the latter system; this is therefore a claim for
20 "off-the-clock" unpaid overtime.

21    Plaintiffs' second theory of liability argues that defendants
22 paid the wrong hourly rate for overtime. Enrollment Counselors

23

24        [1] The cursory factual history in this section is provided for
background only and does not form the basis of the court's
25 decision. The legally relevant facts relied upon by the court are
discussed within the analysis. This statement of facts is
26 essentially the same as that issued in the court's order filed
August 13, 2010; the facts are repeated here for convenience.

1  were offered tuition waivers for University of Phoenix coursework.
2  Plaintiffs argue that because the "time and a half" pay they
3  received for overtime was calculated without including the value
4  of this benefit, they received inadequate compensation for
5  overtime.

6      Plaintiffs' third theory is that defendants caused employees
7  to miss meal periods.   It is undisputed that defendants had a
8  written policy granting employees permission to take a 60 minute
9  meal break on any day in which the employee worked five hours.
10  Plaintiffs argue that despite this policy, employees were
11  frequently obliged to miss meal periods.   Finally, plaintiffs also
12  bring state law claims for waiting time penalties and for
13  inaccurate pay stubs.

14      At least two other suits have been filed claiming that the
15  University of Phoenix failed to fully pay enrollment counselors for
16  overtime work.

17      In Sabol v. The University of Phoenix, No. CV 09-03439-JCJ
18  (E.D. Pa.) ("Sabol"), plaintiffs Erik M. Sabol and Rebecca Odom
19  contend UOP's counselors routinely worked overtime hours without
20  compensation, at the direction of the supervisors.   On May 12,
21  2010, the Eastern District of Pennsylvania certified a nationwide
22  FLSA collective action in Sabol.   2010 U.S. Dist. LEXIS 47145.   In
23  finding that collective certification was appropriate, the Sabol
24  court relied on the uniformity of Enrollment Counselors' duties and
25  allegations a pervasive policy of requiring employees to work
26  unpaid overtime, for example, by requiring employees to attend

3

1   "lunch and learn" sessions or to work on Saturdays without counting

2   that time as hours worked.  Id. at *14-15.  The Sabol court also

3   relied on the Avaya phone records as indicia of hours worked.  Id.

4   at *15.  By order filed August 13, 2010, this court declined to

5   exercise jurisdiction over the FLSA claims advanced in this case,

6   instead transferring these claims to the Sabol court.

7       In Juric v. The University of Phoenix, Inc., No. 09-CV-3214

8   ODW (C.D. Cal.), plaintiff initially filed a putative class action

9   University of Phoenix and Apollo solely bringing claims under

10  California law.  The complaint was filed on April 30, 2009.  On

11  January 6, 2010, the Juric court issued an Order Granting

12  Stipulation for Leave to Amend.  Juric subsequently abandoned his

13  state law class claims, filing an amended complaint stating claims

14  under the FLSA for unpaid overtime wages and other relief.  Id.

15  This amended complaint sought collective action certification for

16  a class composed of enrollment and admission counselors, employed

17  by defendants with the past three years. Id.  On February 16, 2010,

18  defendants filed a motion to dismiss, or in the alternative, stay

19  the Juric FLSA collective action claim. Id. at 6.  While that

20  motion was pending, on April 27, 2010, the parties filed a notice

21  of settlement.  The settlement was finalized on June 18, and the

22  case dismissed on June 21, 2010.   No class or FLSA collective

23  action was ever certified, and the settlement pertains to solely

24  to defendants and the named plaintiff.

25                          **II. Jurisdiction**

26      The Class Action Fairness Act, 28 U.S.C. § 1332(d), provides

1   that

2               The district courts shall have original
                jurisdiction of any civil action in which the
3               matter in controversy exceeds the sum or value
                of $5,000,000, exclusive of interest and
4               costs, and is a class action in which . . .
                any member of a class of plaintiffs is a
5               citizen of a State different from any
                defendant;

6

7   28 U.S.C. § 1332(d)(2).  The court may exercise jurisdiction under

8   this section over putative class actions in which no class

9   certification order has yet been entered.   § 1332(d)(8).   The

10  parties' filings demonstrate that defendants are citizens of

11  Arizona, that the named plaintiffs are citizens of California, and

12  that the exceptions to jurisdiction in paragraphs (d)(4), (d)(5),

13  and (d)(9) do not apply.

14      The remaining issue is whether the $5,000,000 amount in

15  controversy requirement has been satisfied.  Under CAFA, the court

16  aggregates potential class members' claims.   § 1332(d)(6).

17  Jurisdiction is proper unless there is a "legal certainty" that the

18  claim is for less than this amount. St. Paul Mercury Indem. Co. v.

19  Red Cab Co., 303 U.S. 283, 289 (1938), Singer v. State Farm Mut.

20  Auto. Ins. Co., 116 F.3d 373, 375 (9th Cir. 1997).

21      The potential class includes well over one thousand members.

22  On the "off-the-clock" overtime claim for which named plaintiff

23  Adoma seeks class certification, she alleges individual

24  compensatory damages in excess of $34,000 and claims that evidence

25  already produced demonstrates $4,732.47 in liability.   On

26  plaintiffs' claim for statutory waiting time penalties, plaintiffs

5

seek up to the statutory maximum of $4,000 per employee (albeit only for a sub-class estimated to include 500 to 700 employees). Defendants argue that Adoma's evidence does not demonstrate liability, and alternatively that she is entitled to no more than $1,750 in waiting time penalties.  Despite this dispute, *at least* the lesser amounts are "in controversy."

Even the reduced figures (which are less than what plaintiffs seek), if typical and aggregated, exceed the jurisdictional amount.[2]  Defendants respond that the evidence does not demonstrate that other class members' claims for damages will be as high. While plaintiffs may fail to prove damages for class members in excess of these amounts, the amount "in controversy" for these claims exceeds the statutory threshold.  Jurisdiction over class claims is therefore proper under 28 U.S.C. § 1332(d).  The court exercises supplemental jurisdiction over the individual claims (not at issue in the pending class certification motion) pursuant to 28 U.S.C. § 1367.

### III. Class Certification

A party seeking to certify a class must demonstrate that it has met all four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001).  Beginning with Rule 23(b), plaintiffs assert that class certification is proper under (b)(1) or (b)(3). As explained below, (b)(1) is inapplicable here.

---

[2] E.g., 1,000 * $4,700 + $1,750 * 500 = $5,575,000

Subsection (b)(3) requires a showing that common issues "predominate" and that class adjudication is "superior" to other methods of adjudication. Predominance overlaps with, but is not identical to, the requirements of commonality and typicality under Rule 23(a). The court therefore discusses these issues together. The remaining Rule 23(a) requirements, of numerosity and adequacy, are not in dispute. The court concludes that class certification is warranted under Rule 23(b)(3).

## A.    Certification under Rule 23(b)(1) Is Inappropriate

Fed. R. Civ. P. 23(b)(1) provides for certification of a class where individual litigation would either risk establishing "incompatible standards of conduct" for the party opposing certification or be dispositive of the interests of other potential class members. This requires more than "a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts. . . . [and] is therefore not appropriate in an action for damages." Zinser, 253 F.3d at 1193.[3] The mere possibility that individual adjudications will have precedential or stare decisis effects is insufficient. La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 467 (9th Cir. 1973). Nor is this a case where plaintiffs allege that the defendant has a "limited fund" that may be inadequate to

---

[3] Plaintiffs suggest that Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) is to the contrary. Although Hilao certified a class in which damages were sought, that opinion did not discuss Rule 23(b)(1). The court discusses Hilao in greater detail below.

7

1   pay all claims.  Wright and Miller, 7AA Fed. Prac. & Proc. Civ. §

2   1774 (3d ed.).  Accordingly, certification is not appropriate under

3   Rule 23(b)(1).

4   **B.   Commonality, Typicality, and Predominance**

5          The court therefore turns to Rule 23(b)(3).  Rule 23(b)(3)

6   provides for class certification where "questions of law or fact

7   common to class members predominate over any questions affecting

8   only individual members, and . . . a class action is superior to

9   other available methods for fairly and efficiently adjudicating the

10  controversy."   This inquiry relates to, but is in some ways

11  distinct from, the Rule 23(a) requirement that there be "questions

12  of law or fact common to the class" and that the representative

13  party's claim be typical of the class claims.

14         In determining whether common *questions* exist, the court need

15  not  determine  whether  these  questions  will  be  *answered*  in

16  plaintiffs' favor.  Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571,

17  594 (9th Cir. 2010) (en banc).  Determining whether there are

18  common questions "will often, though not always, require looking

19  behind the pleadings to issues overlapping with the merits of the

20  underlying claims."  Id.  The court may not, however, "analyze any

21  portion of the merits of a claim that do not overlap with the Rule

22  23 requirements."  Id.  As to the Rule 23 requirements, the court

23  must perform a "rigorous analysis," but the courts "retain wide

24  discretion in class certification decisions, including the ability

25  to cut off discovery to avoid a mini-trial on the merits at the

26  certification stage."  Id.  As explained below, plaintiffs have

8

1  shown predominance, commonality, and typicality as to each of the

2  five  state-law  claims  for  which  plaintiffs  seek  class

3  certification.

4      **1.   Off-the-Clock Time**

5      California law requires that an employer pay for all hours

6  that it "engage[s], suffer[s], or permit[s]" an employee to work.

7  <u>Morillion v. Royal Packing Co.</u>, 22 Cal. 4th 575, 586 (2000)

8  (quoting a California Wage Order).  This definition is equivalent

9  to the FLSA obligation to pay for work the employer "knows or has

10 reason to believe" the employee performs.  <u>Id.</u> at 585 (quoting 29

11 C.F.R. § 785.11 (1998)).  Thus, a plaintiff may establish liability

12 for an off-the-clock claim by proving that (1) he performed work

13 for which he did not receive compensation; (2) that defendants knew

14 or  should  have  known  that  plaintiff  did  so;  but  that  (3)  the

15 defendants stood "idly by."   <u>Lindow v. United States</u>, 738 F. 2d

16 1057, 1060-62 (9th Cir. 1984) (citing <u>Forrester v. Roth's I.G.A.</u>

17 <u>Foodliner, Inc.</u>, 646 F.2d 413, 414 (9th Cir. 1981)).[4]

18     Plaintiffs state that they will prove these facts using

19 records  in  the  Avaya  computer  system.   The  court  therefore

20 summarizes the pertinent details of this system before addressing

21 whether the system provides a means of common proof, and if so,

22 _____

23     [4] In  opposing  class  certification,  defendants  argue  that
   "[t]here is no evidence that [defendants] had a widespread practice
24 of *requiring* [Enrollment Counselors] to work off-the-clock." Opp'n
   to Class Cert., 12 (emphasis added).  Although such a policy, if
25 proven, would provide evidence in support of the test identified
   above,  such  a  policy  is  neither  necessary  to  the  individual
26 plaintiffs' claims nor for a showing of predominance.

1  whether such commonalities predominate.

2          **a.   The Avaya Phone Records System**

3          When a potential student calls the University of Phoenix, the
4  call is first routed to a nationwide call center located in
5  Phoenix, Arizona.   The call center representative identifies the
6  caller's preferred region.   The Avaya system then transfers the
7  call to an Enrollment Counselor in that region who is available to
8  receive calls.

9          The computer system therefore needs to track when Enrollment
10 Counselors are available to receive calls.   Enrollment Counselors
11 first indicate their availability by logging in to the computer
12 system using an individual code at the start of their shift.   The
13 system then assumes that the employee is available to receive calls
14 until the employee logs out at the end of the day or unless the
15 employee has entered one of nine "aux codes" which indicate
16 unavailability.   These codes correspond to particular activities,
17 including    "meal    break,"    "personal    break,"    "meeting,"
18 "administrative" duties, and "student meetings."   Of the nine aux
19 codes, only the "meal break" pertains to activities for which
20 employees are potentially not entitled to compensation.[5]   If the
21 employee is logged in, has not entered an aux code, but nonetheless

22

23          [5] Under California law, if an employee is relieved of all duty
    during a meal period and not obliged to remain at the work site,
    the meal period is not counted as hours worked.   See, e.g., Bono
24 Enterprises, In. v. Bradshaw, 32 Cal. App. 4th 968 (1995).   As
    explained below, the parties dispute whether Enrollment Counselors
25 were consistently relieved from duty during meal periods.   The
    parties nonetheless agree that at least some meal periods were
26 properly excluded from hours worked.

                                    10

1   does not answer the phone after three rings, the call is
2   transferred to another Enrollment Counselor.

3           **b.    Defendants' Arguments As to The Need for**
4                   **Individualized Inquiries**

5           Defendants make four arguments as to why this system's records
6   are poor indicators of the time an employee spent working.  The
7   court summarizes these arguments in this section, then addresses
8   plaintiffs' reply in the following section.  First, defendants
9   argue that the login/logout times are inadequate.  Defendants
10  contend that employees sometimes login before they begin doing work
11  and that employees sometimes perform non-employment work (such as
12  non-compensable work on University of Phoenix courses the employee
13  is taking) before logging out.  Similarly, employees often forget
14  to logout, in which case the employee remains logged in overnight
15  unless the employee calls someone else who will log out for them.
16  The phone system itself is sometimes inoperative, preventing login
17  and logout.  Finally, when employees work from non-standard
18  locations they can be prevented from logging in and out.

19          Another court has held that similar computerized data could
20  not demonstrate predominance of common issues where the data did
21  not "take into account the possibility that an employee may not
22  have actually worked between the punch-in time and start time or
23  between the end-time and punch-out time."  Forrand v. Federal Exp.
24  Corp., No. CV 08-1360, 2009 WL 648966, *4, 2009 U.S. Dist. LEXIS

25

26

22912, *12 (C.D. Cal. Feb. 18, 2009).[6]  Plaintiffs in this suit apparently concede that the login/logout times are therefore an inadequate indicator of time worked, although it is unclear whether plaintiffs forswear reliance on this information entirely.

Plaintiffs argue that rather than relying on login/logout times, they can look at records of calls made in combination with the aux codes to determine what work an employee was actually doing and when.[7]  Defendants respond that the aux codes are also unreliable.  Some evidence, including depositions of the named plaintiffs, indicates that employees often fail to enter the appropriate aux code or change in aux code when the employee leaves for or returns from lunch, especially when the employee is in a meeting or engaged in another "aux" activity immediately prior to or after lunch.  Although defendants further argue that employees inappropriately fail to distinguish between other aux codes, the "meal break" code is the only potentially non-compensable code, so ambiguity among the others is not relevant to the reconstruction of hours worked.  Plaintiffs acknowledge that employees sometimes

---

[6] This was one of many difficulties relied upon by Forrand. That court further observed in a footnote immediately following the above that the electronic records were only available for employees explicitly excluded from the purported class.  Forrand, 2009 WL 648966, *4 n.7, 2009 U.S. Dist. LEXIS 22912, *12 n.7. In light of the litany of issues in that case, it is difficult to determine which particular factors the Forrand court held were dispositive.

[7] It appears to the court, at least initially, that reliance solely on aux codes and records of calls actually received would not account for time an employee spent waiting to receive calls when no calls were actually received, but that this time should be counted as hours worked.

1    improperly record meal periods.  Plaintiffs nonetheless argue that
2    the question is whether an employee, or employees generally,
3    "regularly forgot to log out for lunch."  The court cannot agree.
4    Plaintiffs' claim is for failure to pay for hours actually worked,
5    and this is a fact specific inquiry.  This is not to say that
6    individual issues predominate: trends may establish, by a
7    preponderance of evidence, that most days in which meal periods
8    were not recorded, the employee in fact took no meal period.  The
9    issue, however, is whether the trend is evidence of individual
10   days, not vice versa.

11        Defendants contend that these inaccuracies require individual
12   inquires.  For example, defendants argue that when phone records
13   indicate that an employee did not take a meal period on a certain
14   day, an individual inquiry will be required to determine whether
15   the employee in fact took a meal period but failed to record it,
16   such that the employee is not entitled to compensation for that
17   time, or whether instead the employee worked through the day
18   without taking a meal period.  <u>Forrand</u>, discussed above, addressed
19   this issue as well, holding that the need for this sort of
20   individualized inquiry was one reason why common issues did not
21   predominate.  <u>Forrand</u>, 2009 WL 648966, *3, 2009 U.S. Dist. LEXIS
22   22912, *9 ("individualized fact inquiries are necessary to
23   determine which mechanics did take a lunch break in accordance with
24   the . . . record.")

25        Defendants' third argument about individual inquiries is that
26   compensation is not owed for de minimis overtime, and that whether

                                    13

1  time was de minimis must be calculated on a fact specific basis.

2  The need to determine whether overtime was de minimis does not

3  itself preclude class or collective certification. Kurihara v. Best

4  Buy Co., No. C 06-01884, 2007 WL 2501698, *10-11, 2007 U.S. Dist.

5  LEXIS 64224, at *29-31 (N.D. Cal. Aug. 29, 2007).

6      Defendants' fourth argument is that plaintiffs have not shown

7  that the Avaya phone records are more reliable than the records

8  contained in the MyHR system.  Employees have an opportunity and

9  incentive to review the MyHR records to correct errors and

10  omissions, but employees have no such opportunity with regard to

11  the Avaya records.  Moreover, on some days, the Avaya records show

12  employees working substantially *less* than eight hours a day, but

13  the employee nonetheless received compensation for eight hours.

14  Opp'n to Class Cert., at 14, n.11.  Plaintiffs have not explained

15  how they purport to address this situation.

16      Summarizing these arguments, there are reasons to think that

17  any method of reconstructing records of hours worked using the

18  Avaya system will be imperfect.  Recognition of these imperfections

19  invites individualized inquiries into their scope.  Plaintiffs

20  acknowledge this problem, but contend that the reliability of the

21  Avaya system, and plaintiffs' proposed use thereof, may be

22  demonstrated using a few representative inquiries whose results

23  will be extrapolated to the class.  Plaintiffs rely principally on

24  Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996).  The court

25  ////

26  ////

1  discusses this argument in the following section.[8]

2         **c.   Whether Representative Inquiries May Be Used**

3         In Hilao, the Ninth Circuit upheld certification of a class

4  of "[a]ll current civilian citizens of the Republic of the

5  Philippines, their heirs and beneficiaries, who between 1972 and

6  1986 were tortured, summarily executed or disappeared while in the

7  custody of military or paramilitary groups." Id. at 774.  The

8  class claims alleged that the defendant Ferdinand E. Marcos,

9  deceased and appearing through his estate, was liable for these

10 acts. Id. at 771.  As to liability, the primary question was

11 whether "Marcos was liable for any act of torture, summary

12 execution, or 'disappearance' committed by the military or

13 paramilitary forces on his orders or with his knowledge." Id. at

14 774.   This was a legal question in which common issues

15 predominated, although the question of proximate cause for any

16 individual's injuries was in part fact-specific. Id. at 776-779.

17         To determine compensatory damages, the Hilao district court

18 used "a statistical sample of the class claims." Id. at 782.  The

19 court randomly selected 137 of the 9,541 potentially valid claims,

20 which was determined to be a statistically significant sample. Id.

21 A special master then deposed these claimants and their witnesses,

22 ─────────────────

23        [8] Plaintiffs alternatively rely on Judge Patel's observation
   that "courts are comfortable with individualized inquires as to
24 damages, but are decidedly less willing to certify classes where
   individualized inquiries are necessary to determine liability."
25 Kurihara, 2007 WL 2501698, *9, 2007 U.S. Dist. LEXIS 64224, *25-26
   (collecting cases).  This dichotomy appears to have limited use
26 with regard to plaintiffs' off-the-clock claim, because liability
   and damages cannot be easily separated.

to determine (1) whether the claimant had been subjected to torture, summary execution, or disappearance as defined by the jury instructions, (2) whether this harm was caused by the Philippine military or paramilitary, and (3) whether the harm occurred within the period at issue. Id. Based on these individual assessments, the special master recommended average compensatory damage awards for subclasses experiencing each type of injury. Id. at 783. The special master's findings as to the 137 individuals and to subclasses were presented to and largely adopted by the jury. Id. at 784. Thus, the 137 individuals received individualized compensatory damage awards and the remaining 9,404 class members received average awards. Id. at 784 n.10.

On appeal, the Ninth Circuit considered only the argument that this method was improper for determining the validity of claims. The court held that appellants had waived any challenge to the propriety of this method for assessing the amount of damages. Id. at 784 n.11. Even on this narrow inquiry, the court recognized that "serious questions" as to whether this method comported with due process. Id. at 785. The court nonetheless concluded that due process was provided. Id. at 786. The defendant's interest was in the aggregate amount of damages; thus, provided that the average was properly calculated, it was of no consequence to defendant that some plaintiffs would have been entitled, in individual adjudications, to more or less than this average. Hilao, 103 F.3d at 786. Plaintiffs' interest in the use of averages was "enormous," however, in light of the fact that individual

1  adjudications were infeasible.   Id.   Balancing these interests
2  under Connecticut v. Doehr, 501 U.S. 1, 10-11 (1991) and Mathews
3  v. Eldridge, 424 U.S. 319 (1976), the court concluded that the
4  method did not offend the Due Process clause.

5      The Ninth Circuit's recent en banc opinion in Dukes affirmed
6  the continuing validity of Hilao.   603 F.3d at 625-27.   Dukes
7  upheld certification of a class of hundreds of thousands of female
8  Wal-Mart employees bringing claims of sex discrimination under
9  Title VII.   In concluding that the class was manageable, the court
10  explained that "Because we see no reason why a similar procedure
11  to that used in Hilao could not be employed in this case, we
12  conclude that there exists at least one method of managing this
13  large class action that, albeit somewhat imperfect, nonetheless
14  protects the due process rights of all involved parties."   Id. at
15  627.

16          d.   Conclusion Regarding Off-the-Clock Claims

17      All potential class members used both the Avaya and MyHR
18  systems.   While defendants argue that the Avaya system provides an
19  inadequate indicator of the number of hours employees actually
20  worked, the types of arguments are common to all class members.
21  Hilao appears to permit a representative inquiry to determine the
22  magnitude of these effects, and at this stage, the court cannot
23  distinguish Hilao.   The remaining questions are also common.
24  Notably, the question of whether the Avaya system gave defendants
25  at least constructive knowledge of the employee overtime is a
26  common question.   Thus, it appears that common questions

1   predominate.  Although defendants argue that the named plaintiffs
2   are not typical, the asserted atypicalities pertain to facts
3   irrelevant to the above theories of liability and proof.
4   Accordingly, plaintiffs have shown commonality, typicality, and
5   predominance of common issues as to their state law off-the-clock
6   claim.

7        **2.    Adequacy of Overtime Compensation: Exclusion of the**
8             **Educational Benefit from Calculation of the "Regular**
9             **Rate"**

10       The second theory of liability for which plaintiffs seek class
11  certification is the claim that defendants compensated overtime at
12  the wrong rate.  Although plaintiffs present this claim under
13  California law, plaintiffs cite only federal authorities, arguing
14  that the California law is equivalent.  Defendants do not dispute
15  this characterization.

16       The FLSA requires that employees receive compensation "at a
17  rate not less than one and one-half times the regular rate at which
18  he is employed" for hours worked in excess of forty per workweek.
19  29 U.S.C. § 207(a)(1).  "Calculating the regular rate entails
20  dividing the remuneration paid by the number of hours worked."
21  Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 909 (9th Cir.
22  2004).  The "regular rate," for purposes of this calculation,
23  "include[s] all remuneration for employment paid to, or on behalf
24  of, the employee," subject to various exceptions.  29 U.S.C. §
25  207(e).  Defendants did not include the value of the tuition
26  benefit in this calculation, and plaintiffs contend that this

1  exclusion was improper.

2       This is primarily a legal question, in that the only apparent

3  and significant employee-specific issue is whether the employee

4  took advantage of the educational benefit.  This issue at most

5  divides the class in two, and the two named plaintiffs are between

6  them typical of each half of this division.  As such, class issues

7  predominate as to this theory.

8       Defendants' arguments against certification of this claim

9  reduce to challenges to the merits.  Dukes reiterates that courts

10 may not look to the merits of claims on class certification except

11 to the extent that such an inquiry is necessary to determine

12 whether common questions predominate.  603 F.3d at 594.

13      **3.   Meal Periods**

14      Plaintiffs further argue that defendants violated their

15 statutory obligation to provide meal periods.  The contours of this

16 obligation are unclear, as explained by Jaimez v. Daiohs USA, Inc.,

17 181 Cal. App. 4th 1286, 1303 (2010).  Some cases have found that

18 "employers need only 'provide' meal breaks and need not ensure the

19 employee actually takes the meal break."  Id. (citing Brown v.

20 Federal Express Corp., 249 F.R.D. 580 (C.D. Cal. 2008)).  Other

21 cases have held that employers "have an affirmative obligation to

22 ensure that workers are actually relieved of all duty."  Id.

23 (quoting Cicairos v. Summit Logistics, Inc., 133 Cal. App. 4th 949,

24 962 (2005), further internal quotations omitted).  Jaimez

25 recognized that the California Supreme Court has granted review in

26 two cases where the Court is likely to address this issue.  Id.

19

1  (citing <u>Brinker Restaurant Corp. v. Superior Court</u> 165 Cal. App.

2  4th 25 (2008), review granted Oct. 22, 2008, S166350, and <u>Brinkley</u>

3  <u>v. Public Storage, Inc.</u>, 167 Cal. App. 4th 1278 (2008), review

4  granted Jan. 14, 2009, S168806).

5      <u>Jaimez</u> concerned class certification under California law.

6  The court held that although the pending California Supreme Court

7  decision would provide clarity as to the merits of the underlying

8  claims, that resolution of those merits was unnecessary to class

9  certification.  <u>Id.</u>[9]  The court went on to hold that "common legal

10  and factual issues predominate over any individual issues with

11  respect to the meal and rest break claims."  <u>Id.</u> at 1305.

12      It appears to this court that the pending clarification of

13  California law will affect the scope of the necessary inquiry and

14  thus the potential predominance of common issues.  If employers

15  must "ensure" that meal periods are taken, the question of whether

16  an employer's actions sufficed will likely present a common

17  question.  If, on the other hand, employers merely must make meal

18  periods available, then even if it is determined that many

19  employees skipped meal periods on many occasions, the court will

20  need to inquire whether employees did so for their own purposes,

21

_____

22      [9] Other courts have stayed meal period claims pending
clarification from the California Supreme Court.  <u>See, e.g.</u>,
23  <u>Gong-Chun v. Aetna, Inc.</u>, No. Civ. 1:09-cv-01995, 2010 U.S. Dist.
LEXIS 56938 *15-16 (E.D. Cal. May 15, 2010) (Oberto, M.J.).  <u>Gong-</u>
24  <u>Chun</u> involved a party's motion for a stay, and the plaintiff in
that purported class action had not yet moved for class
25  certification.  Here, although the court declines to issue a stay
<u>sua sponte</u>, the court notes that class certification will not limit
26  the parties' ability to move for a stay.

1  or instead because the employer obliged them to.  <u>Forrand</u>, 2009 WL

2  648966, *3, 2009 U.S. Dist. LEXIS 22912, *9.

3       Of course, the legal question regarding the scope of the

4  employer's obligation is itself a common question of law.  As to

5  common questions of fact, plaintiffs contend that they will use the

6  Avaya phone records system to demonstrate how often employees

7  skipped meal periods.  For the reasons stated above it appears that

8  this predicate factual question is susceptible to common proof.

9  Accordingly, common issues predominate.

10       **4.   Failure to Itemize Wage Statements**

11       Plaintiffs claim that defendants violated Cal. Labor Code §

12  226.  FAC ¶ 71-73.  Section 226(a) obliges employers to provide all

13  all employees not exempt from overtime laws "an accurate itemized

14  statement in writing showing [inter alia] (1) gross wages earned

15  [and] (2) total hours worked by the employee" during the pay

16  period.  An employee who suffers "injury as a result of a knowing

17  and intentional failure by an employer to comply with subdivision

18  (a)" may bring a claim under Cal. Labor Code § 226(e).[10]

19       Defendants argue that the injury and knowledge aspects of this

20  claim both require individualized inquiries.  Defendants cite

21

22       [10] The court need not address defendants' argument that where
    an off-the-clock claim provides a predicate for a wage statement
23  claim, denial of certification of the former compels denial of
    certification of the latter.  The court similarly does not address
24  defendants' challenge to the merits of the wage statement claim,
    i.e., the contention that by listing as "exception hours" the
25  number of overtime hours worked, the pay stubs communicate to
    Enrollment Counselors that the Counselors worked 40 hours plus or
26  minus any exception hours listed.

21

various cases that have held that class certification was improper

for such a claim, but each cited case is distinguishable.   Two

rested on the fact that individualized issues predominated as to

whether the employees worked unpaid overtime at all--but this court

has found this question to be amenable to class treatment in this

case.   See Jasper v. C.R. England, Inc., No. Civ. 08-5266, 2009

U.S. Dist. LEXIS 34802, *15 (C.D. Cal. Mar. 30, 2009), Blackwell

v. Skywest Airlines, 245 F.R.D. 453, 468 (S.D. Cal. 2007).   A third

held that because plaintiff had not alleged that he failed to

receive adequate pay or that plaintiff had any need to reconstruct

his "pay records," and because plaintiff had not alleged any other

sort of injury, plaintiff had shown no injury.   Villacres v. ABM

Indus., No. Civ. 07-5327, 2009 U.S. Dist. LEXIS 5545 (C.D. Cal.

Jan. 14, 2009).   Plaintiffs here claim that they were underpaid and

prevented from realizing this fact by virtue of inaccurate wage

statements.

Thus, as to injury, the court concludes that common issues

predominate.   It appears that the question of defendants' knowledge

requires no individualized inquiry, because plaintiffs assert a

constructive knowledge theory.

**5.   Waiting Times**

Finally, plaintiffs invoke Cal. Labor Code § 203, which

imposes up to thirty days' wages as a penalty on an employer who

"willfully fails to pay" wages owed to a former employee.   As with

other issues in this case, plaintiffs suggest that they will

demonstrate willfulness by showing that the Avaya system gave

1  defendants at least constructive knowledge of the unpaid overtime.

2  For the reasons stated above, the sufficiency of this type of proof

3  presents is a common question.

4  **C.    Superiority of Class Adjudication**

5       A party seeking class certification under Rule 23(b)(3) must

6  also show that class adjudication is superior to other available

7  methods.   In this case, the potential class is large enough to

8  demonstrate that individual adjudication is impractical; indeed,

9  defendants concede that plaintiffs have satisfied the related

10 requirement of numerosity.

11      Defendants primarily argue that plaintiffs' state law claims

12 should be heard in connection with the Sabol FLSA collective action

13 rather than as a Fed. R. Civ. P. 23 class.   Assuming that such a

14 procedure is permissible, the court finds that it would not be

15 superior.[11]   Admittedly, the California law and FLSA claims

16 implicate many of the same issues.[12]   Nonetheless, there are

17 important differences between the suits. Enrollment Counselors

18 might have potentially valid claims under California law while

19 falling outside the scope of the Sabol collective action.   The

20 Sabol action includes only employees who worked over 40 hours in

21 a week, whereas California law provides a right to overtime for

22 ───────────────

23      [11] At least one court has suggested that state law claims may
   be heard as part of an FLSA collective action, although that court
24 cited no authority or principle for this proposition. Leuthold v.
   Destination Am., 224 F.R.D. 462, 470 (N.D. Cal. 2004).

25      [12] Despite this overlap, "the FLSA does not preempt California
   from applying its own overtime laws." Pacific Merchant Shipping
26 Ass'n v. Aubry, 918 F.2d 1409, 1418 (9th Cir. 1990).

1  employees who work less than 40 hours in a week but more than 8

2  hours in a day.  Moreover, the meal period, wage statement, and

3  waiting time claims here present issues not currently before the

4  Sabol court.  Finally, this court is presumably more familiar with

5  California law than is the Eastern District of Pennsylvania.  For

6  similar reasons, the court declines to transfer the California law

7  Rule 23 class to the Sabol court under the first-to-file rule.

8      Accordingly, the court concludes that a Rule 23(b)(3) class

9  is the superior method for treatment of plaintiffs' state law

10 claims.

11 **E.   Tolling**

12     The court will therefore certify classes of Enrollment

13 Counselors who worked in California.  In order to determine the

14 time period encompassed by the classes, the court must determine

15 whether the Juric action tolled the statute of limitations for

16 these claims.

17     "The filing of a class action tolls the statute of limitations

18 as to all asserted members of the class."  Crown v. Parker, 462

19 U.S. 345, 350 (1983) (quotation omitted).  The defendants in the

20 Juric action were the same as defendants here.  Plaintiffs seek

21 tolling for the period between April 3, 2009 (the date the Juric

22 action was filed) and the time this complaint was filed, on January

23 8, 2010.

24     Defendants raise several arguments regarding tolling.  First,

25 they note that in Juric, the amended complaint that abandoned class

26 claims was filed on January 13, 2010, five days after the complaint

24

1   in this action was filed.  However, the parties in <u>Juric</u> had filed

2   a stipulation requesting dismissal of class claims on December 30,

3   2009, and the court approved this stipulation and granted leave to

4   file an amended complaint on January 6, 2010.[13]  As such, the class

5   allegations had been dismissed in <u>Juric</u> prior to commencement of

6   the instant suit.  The court grants tolling until January 6, 2010,

7   allowing the statute of limitations to run for two days between

8   dismissal of class claims in <u>Juric</u> and the filing of this suit.

9       Defendants also argue that the tolling during the pendency of

10  one class action cannot provide tolling for a subsequent class

11  action.   Defendants provide no authority in support of this

12  purported rule.  The general principle of tolling in this case is

13  clearly established, and if each class member is entitled to

14  tolling, the court sees no reason why the class should not be as

15  well.  The court further notes that because the class claims were

16  voluntarily dismissed in <u>Juric</u>, this is not a case where plaintiffs

17  "attempt[] to relitigate an earlier denial of class certification,

18  or to correct a procedural deficiency in an earlier would-be

19  class."  <u>Catholic Social Servs. v. INS</u>, 232 F.3d 1139, 1149 (9th

20  Cir. 2000).

21      Finally, tolling applies only to claims raised in the initial

22  class action, and defendants argue that plaintiffs' arguments

23  regarding the "regular rate" of pay, and the failure to include the

24  value of educational benefits therein, were not raised in <u>Juric</u>.

25

26      [13] The court takes judicial notice of the docket in <u>Juric</u>.

1 The court agrees.  Therefore, plaintiffs are entitled to tolling
2 as to their off-the-clock, meal period, wage statement, and waiting
3 time theories of liability, but not the regular rate claim (or the
4 above claims insofar as they are predicated on the regular rate
5 claim).  Although the limited scope of tolling will impose some
6 additional complexity on the calculation of damages, the court does
7 not find this complexity to be so great as to render the class
8 unmanageable.

9 **IV. Conclusion**

10     For the reasons stated above, plaintiffs' motion for class
11 certification (Dkt. No. 35) is GRANTED.  Named plaintiffs' counsel
12 is appointed as class counsel.  Fed. R. Civ. P. 23(g). The classes
13 are defined as follows:

14     1.     All current or former Enrollment Counselors who worked
15            at least one week in the State of California for either
16            The University of Phoenix, Inc. or Apollo Group, Inc. at
17            any time between April 5, 2005 and August 13, 2010.
18            ("California Overtime Class") and ("California Meal
19            Break Class") and;

20     2.     All current or former Enrollment Counselors who received
21            at least one paycheck statement for work performed in
22            the State of California for either The University of
23            Phoenix, Inc. or Apollo Group, Inc. at any time between
24            April 5, 2008 and August 13, 2010. ("California Paystub
25            Class") and;

26     3.     All current or former Enrollment Counselors who worked

1  at least one week in the State of California for either

2  The University of Phoenix, Inc. or Apollo Group, Inc. at

3  any time between April 5, 2006 and August 13, 2010 whose

4  employment ended at least once during that same time

5  period. This class includes current employees who worked

6  during the covered time period, ceased working, and then

7  began employment again. ("California Waiting Time

8  Class.")

9  4.  The term "Enrollment Counselors" includes employees with

10  the job title of "enrollment counselor" as well as any

11  other nonexempt employee who utilized the Avaya phone

12  system's Automatic Call Distribution system to receive

13  calls relating to enrollment.

14  IT IS SO ORDERED.

15  DATED:  August 31, 2010.

16

17

18                              LAWRENCE K. KARLTON
19                              SENIOR JUDGE
                                UNITED STATES DISTRICT COURT
20

21

22

23

24

25

26