1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

10  DIANE ADOMA,

11                                           NO. CIV. S-10-0059 LKK/GGH

            Plaintiff,

12
        v.

13                                           O R D E R

THE UNIVERSITY OF PHOENIX,

14  INC., et al.,

15

            Defendants.

16  _____/

17      This class-action wage and hour case was filed by

18  enrollment counselors against their employer, defendant The

19  University of Phoenix, Inc., a wholly-owned subsidiary of defendant

20  Apollo Group, Inc. Presently before the court is a joint motion for

21  final approval of the settlement (ECF No. 139), and class counsel's

22  motion for attorneys' fees and costs. (ECF No. 138.) This matter

23  came on for hearing on December 17, 2012. Having considered the

24  matter, the court will approve the settlement and award attorneys'

25  fees to class counsel in the amount of 29% of the common fund, for

26  the reasons set forth below.

**I. Background**

    **A. Summary of the Litigation to Date**

    The lawsuit alleges violations of state and federal labor laws by the University of Phoenix. Plaintiffs' original claims were made under both the California Labor Code and the federal Fair Labor Standards Act ("FLSA"). On August 13, 2010, this court declined to exercise jurisdiction over plaintiffs' FLSA claims under the first-to-file rule, and transferred the FLSA claims to the Eastern District of Pennsylvania, where a complaint involving the same plaintiffs and issues had already been filed (Sabol v. The University of Phoenix, No. CV 09-03439-JCJ (E.D. Pa.)), and where a nationwide collective action was certified. (Order, August 13, 2010, ECF No. 70.) After supplemental briefing from the parties on the issue of the court's jurisdiction over the state law claims, this court concluded that jurisdiction over class claims under state law was proper under 28 U.S.C. § 1332(d), and that supplemental jurisdiction over individual claims was proper under 28 U.S.C. § 1367. (Order, August 31, 2010, ECF No. 83.)

    Plaintiffs allege the following violations of state law: that they worked unpaid "off-the-clock" overtime, that defendants paid the wrong hourly rate for overtime, that defendants caused employees to miss meal periods, that defendants provided inaccurate pay stubs, and that the plaintiffs are entitled to waiting-time penalties.

    In its August 31, 2010 order, the court granted class certification under Fed. R. Civ. P. 23(b)(3), holding that

questions of law or fact common to the class predominated over questions affecting individual members, and further, that class treatment was the superior method for handling plaintiffs' state law claims. The court certified the following classes:

> 1. All current or former Enrollment Counselors[1] who worked at least one week in the State of California for either The University of Phoenix, Inc. or Apollo Group, Inc. at any time between April 5, 2005 and August 13, 2010. ("California Overtime Class") and ("California Meal Break Class");

> 2. All current or former Enrollment Counselors who received at least one paycheck statement for work performed in the State of California for either The University of Phoenix, Inc. or Apollo Group, Inc. at any time between April 5, 2008 and August 13, 2010. ("California Paystub Class"); and

> 3. All current or former Enrollment Counselors who worked at least one week in the State of California for either The University of Phoenix, Inc. or Apollo Group, Inc. at any time between April 5, 2006 and August 13, 2010 whose employment ended at least once during that same time period. This class includes

---

[1] The court defined the term "Enrollment Counselors" to include employees with the job title of "enrollment counselor," as well as any other nonexempt employee who utilized the Avaya phone system's Automatic Call Distribution system to receive calls relating to enrollment. (ECF No. 83.)

1    current employees who worked during the covered time
2    period, ceased working, and then began employment
3    again. ("California Waiting Time Class.")

4  Defendants sought permission to appeal the class certification
5  order; the Ninth Circuit denied the petition to appeal. (ECF No.
6  110.)

7  The parties ultimately reached a settlement, and on April 16,
8  2012, filed a joint motion for certification of settlement classes
9  and for preliminary approval of a settlement. Because the parties
10  sought certification of settlement classes with different
11  definitions than the classes previously certified, the court
12  ordered additional briefing from the parties on the legal
13  consequences of the change in definitions. (Order, May 14, 2012,
14  ECF No. 134.) The parties filed their joint response on June 4,
15  2012 (ECF No. 135), and after reviewing it, the court granted
16  preliminary approval of the proposed class settlement on June 18,
17  2012. (ECF No. 137.)

18  The instant motions for final approval of the settlement and
19  for attorneys' fees and costs were originally set for hearing on
20  November 5, 2012. After examining the parties' filings in support
21  of these motions, the court was unable to find evidence that the
22  parties had complied with notice requirements under the Class
23  Action Fairness Act of 2005, Pub. L. 109-2, 199 Stat. 4-14
24  ("CAFA"), and therefore continued the fairness hearing while
25  ordering briefing on this topic. (ECF No. 140.) The parties filed
26  their joint response on November 5, 2012. (ECF No. 141.)

**B. Material Terms of the Settlement Agreement.**

The material terms of the Settlement Agreement are as follows:

**1. Composition of Settlement Class**

The settlement class is defined as, for the period from April 5, 2005 through June 19, 2012,

(a) all current and former Enrollment Counselors in California who were previously sent a class notice in this action, but who did not opt out of the class;

(b) all Enrollment Counselors in California hired from August 13, 2010 to and including June 19, 2012 who were not previously sent a class notice, and who do not opt out of this settlement;

(c) all Enrollment Counselors in California who originally opted into the action entitled <u>Sabol, et al., v. Apollo Group, Inc., et al.</u>, United States District Court, Eastern District of Pennsylvania, No. 2:09-cv-03439-JCJ ("<u>Sabol</u>"), and who subsequently excluded themselves from the <u>Sabol</u> settlement;[2] and

(d) one individual (Angelica Michelle Lee) who previously communicated to class counsel her intent to opt in to the

_____

[2] According to the parties' Joint Brief Addressing Questions Raised in Court's May 14, 2012 Order Concerning Motion for Preliminary Approval of Class Action Settlement (ECF No. 135), this portion of the settlement class is empty, as the single Enrollment Counselor in California who opted out of the <u>Sabol</u> settlement subsequently filed an individual wage-and-hour lawsuit and entered into an individual settlement with defendants.

1    severed FLSA action transferred to the U.S. District Court

2    for the Eastern District of Pennsylvania, which will be

3    dismissed with prejudice if the court approves the

4    settlement herein. (See Settlement Agmt. ¶¶ 2.6, 2.25,

5    7.3.1, ECF No. 129-3.)

6  The settlement class excludes all Enrollment Counselors in

7  California who opted into <u>Sabol</u> but who did not exclude themselves

8  from the settlement therein. (Id. ¶ 2.6.)

9              **2. Settlement Amount**

10       Defendants have agreed to a maximum settlement amount of

11  $4,000,000, which includes the cost of administration of the

12  settlement, reasonable attorneys' fees not to exceed one-third of

13  the maximum settlement amount, attorneys' costs not to exceed

14  $25,000, service payments to the class representatives not to

15  exceed $5,000 per class representative, an individual settlement

16  payment of $20,000 to class representative Diane Adoma, and a

17  payment of $50,000 to the California Labor and Workforce

18  Development Agency. The remainder of the $4,000,000 will comprise

19  a settlement pool to be divided among qualified claimants based on

20  the number of weeks they worked during the relevant period.

21  (Settlement Agmt. ¶¶ 2.22, 6.2.1.) If the qualified claimants do

22  not claim at least 50% of the settlement pool, then the amounts

23  paid to each qualified claimant will increase *pro rata* until 50%

24  is paid out. (Settlement Agmt. ¶ 6.2.1.)

25              **3. Scope of Release**

26       Upon final approval of the settlement agreement, those class

6

1  members who have not validly objected to or opted out of the
2  settlement will be barred from bringing any causes of action or
3  claims against defendants based on facts and allegations set forth
4  in plaintiffs' Second Amended Class Complaint. (Settlement Agmt.
5  ¶ 2.11, § 6.8.) The named class representatives have consented to
6  a more comprehensive release of any and all "claims, obligations,
7  demands, actions, rights, causes of action, and liabilities," known
8  or unknown, against defendants. (Id.)

9      **C. Performance of the Settlement Agreement.**

10      The procedures for giving notice to the class members were the
11  responsibility of the class settlement administrator, Simpluris,
12  Inc. ("Simpluris"). (Settlement Agmt. § 7.2.)

13      On June 25, 2012, The University of Phoenix provided Simpluris
14  with names, addresses, social security numbers, and number of weeks
15  worked for 1,725 potential class members. (Butler Dec. ¶ 6.) On
16  August 7, 2012, class notices were mailed to these individuals via
17  first-class mail. (Butler Dec. ¶ 8.)

18      As of October 9, 2012, 393 notices had been returned to
19  Simpluris as undeliverable. (Butler Dec. ¶ 9.) Simpluris performed
20  address traces and mailed out new class notices; ultimately, only
21  45 notices proved undeliverable. (Id.)

22      As of October 9, 2012, Simpluris had received claims from 557
23  class members, representing 31.76% of the individuals and 43.68%
24  of the total work weeks in the settlement class. (Butler Dec.
25  ¶ 10.) Simpluris received no requests for exclusion from the
26  settlement, nor any objections to the settlement. (Butler Dec. ¶¶

1  11, 12.)

2  **II. Standard re: Final Approval of Class Action Settlements**

3       Whether to approve a class action settlement is "committed to

4  the sound discretion of the trial judge." <u>Class Plaintiffs v.</u>

5  <u>Seattle</u>, 955 F.2d 1268, 1276 (9th Cir. 1992). A strong judicial

6  policy favors settlement of class actions. <u>Id.</u>

7       Nevertheless, the court must examine the settlement as a whole

8  for overall fairness. <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026

9  (9th Cir. 1998) Neither district courts nor appellate courts have

10 the power to delete, modify, or substitute provisions in the

11 negotiated settlement agreement. <u>Id.</u> "The settlement must stand or

12 fall in its entirety." <u>Id.</u>

13      In order to approve the class action settlement herein, the

14 court must conduct a three-step inquiry. First, it will assess

15 whether defendants have met notice requirements under the Class

16 Action Fairness Act. Next, it will determine whether the notice

17 requirements of Federal Rule of Civil Procedure 23(c)(2)(B)[3] have

18 been satisfied. Finally, the court must find that the proposed

19 settlement is fair, reasonable, and adequate under Rule 23(e)(3).

20 **III. Analysis re: Final Approval of Class Action Settlement**

21      **A. Class Action Fairness Act**

22      The parties agree that this action is subject to notice

23 requirements under the federal Class Action Fairness Act ("CAFA").

24 (Joint Brief, 2:22-27, ECF No. 142.) When settlement is reached in

25 _____

26      [3] Hereinafter, the term "Rule" means the applicable Federal
Rule of Civil Procedure.

1   certain class action cases, CAFA requires as follows:

2       Not later than 10 days after a proposed settlement of
        a class action is filed in court, each defendant that
3       is participating in the proposed settlement shall
        serve [notice of the proposed settlement] upon the
4       appropriate State official of each State in which a
        class member resides and the appropriate Federal
5       official....

6   28 U.S.C. § 1715(b).[4] The statute provides detailed requirements

7   for the contents of such a notice. Id.

8       The court is precluded from granting final approval of a class

9   action   settlement   until   the   notice   requirement   is   met.

10  Specifically:

11      An order giving final approval of a proposed
        settlement may not be issued earlier than 90 days
12      after the later of the dates on which the appropriate
        Federal official and the appropriate State official
13      are served with the notice required under [28 U.S.C.
        § 1715(b)].

14

15  28 U.S.C. § 1715(d).

16      On April 16, 2012, the parties filed their proposed settlement

17  with the court. (ECF No. 129.) On June 19, 2012, the court entered

18  its order granting preliminary approval of the settlement and

19  conditionally certifying the settlement class. (ECF No. 137.) On

20  June 29, 2012, defendants sent notice of the settlement via

21  overnight mail to the U.S. Attorney General and 30 state Attorneys

22  General. (Gao Dec. ¶ 3, Ex. A, ECF No. 142-1.) Under 28 U.S.C.

23  § 1715(b), defendants were required to serve this notice within 10

24

─────────────

25      [4] "Appropriate Federal official" and "appropriate State
    official" are respectively defined by 28 U.S.C. § 1715(a),
26  subdivisions (1) and (2).

1   days of filing of the proposed settlement with the court, rather

2   than 10 days of the court's approval of the settlement. But the

3   notices were sent 129 days before November 5, 2012, the date

4   originally scheduled for final approval of the settlement, thereby

5   complying with 28 U.S.C. § 1715(d)'s requirement of a 90-day notice

6   period.

7       The parties received no objections to the settlement from

8   state and federal officials, except a letter from the Office of the

9   Attorney General of Texas (Gao Dec. Ex. B) asserting that, by

10  failing to provide notice within 10 days of filing the proposed

11  settlement, defendants had triggered the penalties set forth in 28

12  U.S.C. § 1715(e)(1), which provides: "A class member may refuse to

13  comply with and may choose not to be bound by a settlement

14  agreement...in a class action if the class member demonstrates that

15  the notice required under subsection (b) has not been provided."

16  The Texas Attorney General's letter does not address or object to

17  any substantive aspects of the settlement.

18      The court respectfully disagrees with the Texas Attorney

19  General that class members can refuse to be bound by the settlement

20  agreement simply because defendants were late in serving CAFA

21  notices. The paragraph, titled "Limitation," that immediately

22  follows the CAFA section cited by the Texas Attorney General's

23  office provides: "A class member may not refuse to comply with or

24  to be bound by a settlement agreement...under paragraph (1) if the

25  notice required under subsection (b) was directed to the

26  appropriate Federal [and state] official[s]...." 28 U.S.C.

§ 1715(e)(2). Research has failed to find a case interpreting this paragraph. The court reads it to mean that even if defendants are late in serving notice to state and federal officials, class members may not exempt themselves from a settlement so long as at least 90 days elapse between service of the notice and entry of an order granting final approval of the settlement, as required by 28 U.S.C. § 1715(d). To hold otherwise and allow class members to opt out of the class settlement based on late notice would result in the voiding of the settlement herein; this seems an unduly harsh result for failing to comply with a technical requirement, especially given that state and federal officials have had the statutory period to file objections with the court.

    In reaching this conclusion, the court is guided by the decisions of numerous courts that late mailing of notices to state and federal officials under CAFA is not fatal to approval of settlements. See In re Processed Egg Products Antitrust Litigation, 284 F.R.D. 249, 258 n.12 (E.D.Pa. 2012) ("Over ninety days have elapsed since [defendant] served the appropriate state or federal officials with the CAFA notice, and there have been no requests for hearings or objections to the settlement made. It follows that, although the notice requirements under CAFA have not been fully met on a technical basis, the substance of the requirements have been satisfied insofar as giving federal and state officials sufficient notice and opportunity to be heard concerning the [s]ettlement."); Kay Co. v. Equitable Prod. Co., No. 06 Civ. 00612, 2010 WL 1734869 at *4, 2010 U.S. Dist. LEXIS 41892 at *14 (S.D.W.Va. Apr. 28, 2010)

1   ("Although [defendant] sent notice packets to the appropriate State
2   and Federal officials, it did not provide such notice promptly
3   after the Agreement was filed, as required by CAFA.... Since more
4   than 100 days have passed since service was perfected and since
5   there have been no adverse comments from any of the aforesaid State
6   or Federal officials, the Court FINDS that compliance with CAFA is
7   satisfactory."); <u>Beaty v. Continental Automotive Systems U.S.,</u>
8   <u>Inc.</u>, Nos. CV-11-S-890-NE, CV-10-S-2440-NE, 2012 WL 1886134, 2012
9   U.S. Dist. LEXIS 70391 (N.D.Ala. May 21, 2012) (granting final
10  approval of class action settlement even though defendant provided
11  notice to the relevant attorneys general eleven days after
12  preliminary approval of the settlement, rather than ten days after
13  filing of the proposed settlement with the court).

14      In sum, defendants served proper notice under CAFA. As more
15  than 90 days have passed since this date, class members may not
16  refuse to be bound by the settlement agreement simply because
17  defendants were late in providing notice.

18      **B. Rule 23**

19          **1. Rule 23(a) and (b)**

20      The court previously certified classes in this matter under
21  Rule 23(b)(3) (ECF No. 70), so need not find anew that the
22  settlement class meets the certification requirements of Rule 23(a)
23  and (b). <u>See</u>, <u>e.g.</u>, <u>Harris v. Vector Marketing</u>, No. C-08-5198, 2012
24  WL 381202 at *3, 2012 U.S. Dist. LEXIS 13797 at *7 (N.D.Cal. Feb.
25  6, 2012) (Chen, J.) ("As a preliminary matter, the Court notes that
26  it previously certified...a Rule 23(b)(3) class...[and thus] need

1  not analyze whether the requirements for certification have been
2  met and may focus instead on whether the proposed settlement is
3  fair, adequate, and reasonable"); <u>In re Apollo Group Inc.</u>
4  <u>Securities Litigation</u>, Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT,
5  CV 04-2334-PHX-JAT, 2012 WL 1378677 at *4 (D.Ariz. Apr. 20, 2012)
6  (Teilborg, J.) ("The Court has previously certified, pursuant to
7  Rule 23 of the Federal Rules of Civil Procedure, and hereby
8  reconfirms its order certifying a class").

9       **2. Rule 23(c)(2) Notice Requirements**

10      Class actions brought under Rule 23(b)(3) must satisfy the
11  notice provisions of Rule 23(c)(2). In its order of June 20, 2012
12  (ECF No. 137), the court approved the form of class notice sent to
13  members of the settlement class. According to Simpluris, it
14  initially sent class members a notice listing an erroneous class
15  start date of April 5, 2012, rather than April 5, 2005. (Butler
16  Dec. ¶ 9, ECF No. 139-2.) But a correction letter was sent to class
17  members within eight days of the erroneous mailing. In addition to
18  explaining the error, the correction letter provided an address and
19  toll-free number for Simpluris, and directed recipients to contact
20  Simpluris with any questions. (Butler Dec. Ex. B.) In light of the
21  steps taken to mitigate the error, the court finds no reason to
22  revisit its earlier determination that notice to the settlement
23  class was proper.

24      **C. Assessing whether the Class Settlement is Fair,**
        **Reasonable, and Adequate under Rule 23(e)**
25

26      Under Rule 23(e), "the claims, issues, or defenses of a

1  certified class may be settled...only with the court's approval."

2  This requirement of court approval for settlement is in contrast

3  to the procedures for settlement in most other civil actions. "The

4  primary concern of [Rule 23(e)] is the protection of those class

5  members, including the named plaintiffs, whose rights may not have

6  been given due regard by the negotiating parties." <u>Officers for</u>

7  <u>Justice v. Civil Service Com.</u>, 688 F.2d 615, 624 (9th Cir. 1982).

8  The court's inquiry is procedural in nature. <u>Id.</u>

9      Under Rule 23(e)(2), "If the proposal would bind class

10  members, the court may approve it only after a hearing and on

11  finding that it is fair, reasonable, and adequate." The parties are

12  before the court on such a hearing.

13      In determining whether a settlement agreement is fair,

14  adequate, and reasonable to all concerned, the court may consider

15  some or all of the following factors:

16      (1) the strength of the plaintiff's case;

17      (2) the risk, expense, complexity, and likely duration of

18  further litigation;

19      (3) the risk of maintaining class action status throughout

20  the trial;

21      (4) the amount offered in settlement;

22      (5) the extent of discovery completed, and the stage of the

23  proceedings;

24      (6) the experience and views of counsel;

25      (7) the presence of a governmental participant; and

26      (8) any opposition by class members.

1  <u>Linney v. Cellular Alaska Partnership</u>, 151 F.3d 1234, 1242 (9th

2  Cir. 1998). This list of factors is not exclusive and the court may

3  balance and weigh different factors depending on the circumstances

4  of each case. <u>Torrisi v. Tucson Elec. Power Co.</u>, 8 F.3d 1370, 1376

5  (9th Cir. 1993).

6          **1. The Strength of Plaintiff's Case**

7          When assessing the strength of plaintiff's case, the court

8  does not reach "any ultimate conclusions regarding the contested

9  issues of fact and law that underlie the merits of this

10  litigation." <u>In re Wash. Pub. Power Supply Sys. Sec. Litig.</u>, 720

11  F.Supp 1379, 1388 (D.Arizona 1989). The court cannot reach such a

12  conclusion, because evidence has not been fully presented. <u>Id.</u>

13  Instead, the court is to "evaluate objectively the strengths and

14  weaknesses inherent in the litigation and the impact of those

15  considerations on the parties' decisions to reach these

16  agreements." <u>Id.</u>

17          Both federal and California law regarding class actions is in

18  flux, particularly in the area of employment law. Lower courts are

19  still sorting out the meaning of recent decisions like <u>Wal-Mart</u>

20  <u>Stores, Inc.</u>, __ U.S. __, 131 S.Ct. 2541 (2011), and <u>Brinker</u>

21  <u>Restaurant Corp. v. Sup. Ct.</u>, 53 Cal.4th 1004 (2012) (holding that

22  employers need not ensure that employees do no work during off-duty

23  meal periods). But there is little doubt that, as a result of these

24  decisions, plaintiffs face increased difficulties in winning wage-

25  and-hour class action lawsuits.

26          Plaintiffs alleged that defendants failed to provide meal

1   breaks in violation of California law. In conducting discovery,
2   plaintiffs obtained and analyzed telephone records for 58
3   employees. They concluded that these records "provided evidence of
4   numerous missed meal breaks," but that "there were far more days
5   when meals were taken by the employees." (Mot. for Final Approval
6   9:7-16, ECF No. 139.) They also note that the University of Phoenix
7   had a company policy of permitting employees to take meal breaks
8   and of routing calls to other employees during these breaks. (Id.)
9   The parties conclude – correctly, in the court's view – that given
10  these facts and the holding in <u>Brinker</u>, "any damages for missed
11  meals would be highly speculative." (Id.)

12      Turning to plaintiffs' claims that the defendants failed to
13  pay employees wages due upon termination, the parties point to the
14  difficulties in proving that this withholding was willful, as
15  required by Cal. Lab. Code § 203. (Mot. for Final Approval 9:21-
16  25.)

17      Finally, in claiming unpaid overtime, plaintiffs would have
18  been confronted with the fact that any employee "who reported
19  overtime into the payroll system was paid for that overtime." (Mot.
20  for Final Approval 9:25-10:3.) Class members were among those who
21  reported and were paid for overtime work. As a result, class
22  members would have been required to prove that defendants prevented
23  or discouraged them from reporting some, but not all, of their
24  overtime.

25      The legal and factual hurdles outlined herein weigh in favor
26  of settlement approval.

**2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required. "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D.Cal. 2004) (Baird, J.) (quoting 3 Newberg on Class Actions § 11:50 (4th ed.2012)).

This would have been a complex and expensive case to take to trial. Plaintiffs were relying on voluminous telephone records that would have required expert testimony to present to the jury. (Mot. for Final Approval 10:18-22.) The parties estimate that the experts would have charged in excess of $100,000 simply to evaluate the phone records. (Id.)

On the other hand, by the time the parties notified the court that they had reached a settlement (ECF No. 123), the plaintiff classes had been certified, the parties had concluded discovery and motion practice (including arguing cross-motions for summary judgment), and trial was less than four months away. Settlement therefore did not shorten the likely duration of further litigation.

Accordingly, the court finds that this factor weighs only slightly in favor of settlement approval.

////

////

1          **3. The Risk of Maintaining Class Action Status
              Throughout the Trial**

2

3          Under Rule 23, the court may revisit its prior grant of

4    certification   at   any   time   before   final   judgment.

5    Fed.R.Civ.P. 23(c)(1)(c) ("An order under that grants or denies

6    class certification may be altered or amended before final

7    judgment"). So it is possible that the class could have been

8    decertified or modified before the conclusion of trial.

9    Fed.R.Civ.P. 23(d) ("In conducting an action under this rule, the

10   court may issue orders that...(D) require that the pleadings be

11   amended to eliminate therefrom allegations as to representation of

12   absent persons, and that the action proceed accordingly.") Given

13   the complexity of this case, particularly plaintiffs' reliance on

14   voluminous telephone records as evidence of defendants' acts and

15   omissions, circumstances could arise at trial to justify

16   decertification. Accordingly, this factor weighs in favor of

17   approving the settlement

18                **4. The Amount Offered in Settlement**

19         The parties negotiated a $4,000,000 settlement. According to

20   class counsel, his analysis of defendants' telephone records led

21   him to calculate a potential range of damages from $933,729 to

22   $4,429,042. (Tracy Dec. in Supp. of Mot. for Final Approval ¶ 3,

23   ECF No. 139-1.) His overall best case damages calculation was

24   $10,281,497. (Mot. for Final Approval 16:4-5.)

25         "The fact that a proposed settlement may only amount to a

26   fraction of the potential recovery does not, in and of itself, mean

                                   18

that the proposed settlement is grossly inadequate and should be disapproved." Linney, 151 F.3d at 1242 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2nd Cir. 1974)). And, as the Ninth Circuit has pointed out, "parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." Rodriguez v. West Publishing Corp., 563 F.3d 948, 965 (9th Cir. 2009).

Both sides engaged in significant discovery, including taking five depositions. Plaintiffs conducted extensive analysis of defendants' phone records. The parties ultimately reached a settlement with the help of an experienced mediator. (Mot. for Final Approval, 5:20-28, 6:1-9.) The negotiated settlement amount lies within class counsel's estimate of damages.

The court therefore finds that the negotiated settlement amount is a factor in favor of settlement approval.

**5. The Extent of Discovery Completed, and the Stage of the Proceedings**

"A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." DIRECTV, Inc., 221 F.R.D. at 528. "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." Id. at 527 (quoting 5 Moore's Federal Practice, § 23.85[2][e] (Matthew Bender

1  3d ed)).

2      Here, the parties engaged in formal written discovery,

3  exchanging requests for production of documents. Defendants deposed

4  both class representatives, and plaintiffs deposed three of

5  defendants' representatives. The settlement was largely the result

6  of arms-length negotiations conducted by an experienced mediator.

7  (Mot. for Final Approval 5:20-28, 6:1-9.)

8      This factor weighs in favor of settlement approval.

9                **6. The Experience and Views of Counsel**

10     "Great weight is accorded to the recommendation of counsel,

11 who are most closely acquainted with the facts of the underlying

12 litigation. This is because parties represented by competent

13 counsel are better positioned than courts to produce a settlement

14 that fairly reflects each party's expected outcome in the

15 litigation." <u>DIRECTV, Inc.</u>, 221 F.R.D. at 528 (internal citations

16 and quotations omitted).

17     Class counsel states that he has served as lead counsel or co-

18 counsel in numerous class action cases. (Tracy Dec. in Supp. of

19 Mot. for Atty. Fees. ¶¶ 7-8, ECF No. 138-1.) Several of these cases

20 address highly technical issues regarding additional payments that

21 need to be included in the regular rate of pay, such as the tuition

22 benefit provided to employment counselors herein. (Mot. for Final

23 Approval 11:5-10.) He concludes that, based on his "extensive

24 experience...in litigating overtime issues regarding the regular

25 rate of pay and other technical issues with the pay due to hourly

26 employees," he is of the view that the settlement represents a fair

1    result for the class. (Id. 5:11-14.)

2         Based on class counsel's statements, this factor does not

3    weigh against settlement approval.

### 7. The Presence of a Governmental Participant

5         Plaintiffs sought to enforce claims under California's Private

6    Attorney General Act of 2004, Cal. Labor Code § 2698, *et seq.*

7    ("PAGA") on behalf of the state and affected employees. The

8    settlement will result in a $50,000 payment to the California Labor

9    and Workforce Development Agency. This factor weighs in favor of

10   approval.

### 8. Opposition by Class Members

12        The class administrator did not receive any requests for

13   exclusion from the settlement class, nor any objections to the

14   settlement.

15        The court has received one set of objections, in the form of

16   a letter, dated November 17, 2012, from class representative Diane

17   Adoma.(ECF No. 143.)

18        Adoma's objections to the proposed settlement are as follows.

19   First, Adoma objects to being paid only $25,000 in settlement of

20   her claims: $5000 as payment for serving as a named representative,

21   and $20,000 in settlement of her individual claims. According to

22   Adoma, this amount is inadeqate because she "initially filed an

23   individual lawsuit for $475,000...."[5] Adoma also claims she has

24   

25        [5] This objection appears to misconstrue the penalties sought
     in the initial complaint, which includes a prayer for "Civil
26   penalties under the Private Attorney General Act in an amount in
     excess of $400,000 and subject to proof at trial." (Complaint 19,

"extensive future employment damages relating to the lawsuit," which she apparently feels are not adequately compensated for by the $25,000 she is receiving.

Adoma then raises several objections regarding the inadequacy of the settlement payment relative to her current circumstances:

- "My economic status and future employability has dramatically decreased and when you factor in the over age 50 and the baby boomer stigma it gets even worse. As of today, I am unemployed and severely underemployed with a $100,000 plus in student loan debt not counting other debt and many, many unpaid medical bills for health and dental." [*sic*.]

- "I have called the DV hotline several times because by definition I have been told that I am a victim of financial abuse.... I need to be fairly compensated and I am of the opinion that $25,000 is robbery and puts me in harm's way."

While the court is quite sympathetic to the financial straits

_____

ECF No. 2.) The complaint alleges civil penalties of $100,000 or more, respectively, for violations of California statutes governing overtime (Cal. Lab. Code § 510) (Complaint ¶ 133), meal and rest periods (Cal. Lab. Code § 226.7) (Complaint ¶ 138), pay stub requirements (Cal. Lab. Code § 226(a)) (Complaint ¶ 146), and issuance of paychecks payable within California (Cal. Lab. Code § 212) (Complaint ¶ 159). These amounts, when summed, appear to be the source of the $400,000 sought under PAGA. But under Cal. Labor Code § 2699(i), any civil penalties under PAGA must be divided, with 75% paid to the California Labor and Workforce Development Agency and 25% paid to the plaintiff. Therefore, even assuming that Adoma had prevailed at trial and obtained the full amount she was seeking, she would have obtained closer to $175,000 than $475,000.

1  in which Adoma finds herself, as a legal matter, it would be
2  entirely inappropriate to take into account her current
3  circumstances in deciding whether to approve the settlement.

4        Finally, Adoma asserts that her attorneys failed to keep her
5  informed and/or failed to adequately represent her interests:

6    •    "I...was told that requesting certification for class
7         action [*sic*] would not impact the amount of that award
8         to me as one of the two leading plaintiffs."

9    •    "I requested copies of negotiation documents and
10        transcripts from [the] mediation hearing from my
11        attorney several months ago to review and consider
12        getting additional legal counsel and as of today have
13        not received any even though I agreed to pay for those
14        documents."

15   •    "My attorney did not argue on my behalf at the
16        mediation and I was discouraged or should I say I was
17        told that it was not necessary for me to attend this
18        mediation."

19   •    "My attorney Michael Tracy has not kept me reasonably
20        informed...."

21   •    "I was told the following by my lawyer. '...the
22        University of Phoenix will only settle this case if
23        you only get ONLY $25,000....'" (emphasis in original)

24   •    "I am officially disputing my attorney fees and any
25        other third party fees because I have not received
26        reasonable legal counseling and representation."

1        •        "I am seriously considering filing a lawsuit against

2                 Michael Tracy and filing a formal complaint with the

3                 California bar against both he and his staff for not

4                 fairly representing my best interest."

5        A class representative's objections are usually insufficient,

6   in and of themselves, to derail a settlement. As noted in the

7   Manual for Complex Litigation, "a class representative cannot alone

8   veto a settlement, especially one that has been presented to and

9   approved by the court." Federal Judicial Center, <u>Manual for Complex</u>

10  <u>Litigation</u> § 21.642 (4th ed.). In support of this position, the

11  Manual cites <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 864 F.Supp

12  1422, 1430 (S.D.N.Y. 1994), which provides in pertinent part:

13           To empower the Class Representatives with what would
             amount to an automatic veto over the Proposed
14           Settlement does not appear to serve the best interests
             of Rule 23 and would merely encourage strategic
15           behavior designed to maximize the value of the veto
             rather than the settlement value of their claims. The
16           courts have recognized that the duty owed by class
             counsel is to the entire class and not dependent on
17           the special desires of the named plaintiffs.... The
             rationale implicit in these decisions is sound: the
18           named plaintiffs should not be permitted to hold the
             absentee class hostage by refusing to assent to an
19           otherwise fair and adequate settlement in order to
             secure their individual demands.

20

21  <u>Id.</u> (internal citations and quotations omitted). Similarly, the

22  Ninth Circuit has held that class representatives such as Adoma

23  "should not now be allowed to play the role of spoilers for a

24  [large settlement class] when they could have chosen to not be

25  bound by the settlement." <u>Marshall v. Holiday Magic, Inc.</u>, 550 F.2d

26  1173, 1177 (9th Cir. 1977) (upholding approval of settlement of a

                                    24

1   complicated Rule 23(b)(3) securities and antitrust class action).

2        That said, in at least one instance, the Ninth Circuit has

3   found that a district court erred in approving a class action

4   settlement where the class representative "presented written

5   objections to the proposed settlement, arguing, *inter alia*, that

6   the settlement was not substantively fair to the plaintiff class

7   and that the attorney for [the] plaintiff class did not adequately

8   represent the [class representative's] personal interests."

9   <u>Ficalora v. Lockheed California Co.</u>, 751 F.2d 995, 996 (9th Cir.

10  1985). The court remanded, instructing the district court to

11  consider the class representative's objections in detail and to

12  examine the settlement for possible conflicts of interest by

13  counsel or overreaching by defendant. <u>Id.</u>

14       <u>Ficalora</u>'s central holding appears to be that, "[b]efore

15  approving a class action settlement, the district court must reach

16  a reasoned judgment that the proposed agreement is not the product

17  of fraud or overreaching by, or collusion among, the negotiating

18  parties and that the settlement, taken as a whole, is fair,

19  reasonable and adequate to all concerned parties." <u>Id.</u> at 997

20  (<u>citing</u> <u>Officers for Justice v. Civil Service Commission</u>, 688 F.2d.

21  615, 624 (9th Cir. 1982)). While rarely invoked, this holding

22  appears to remain good law in the Circuit. <u>See</u>, <u>e.g.</u>, <u>Wiley v.</u>

23  <u>Delta Airlines</u>, 930 F.2d 921 (9th Cir. 1991) (upholding settlement

24  approval where the district court had inquired into the questioned

25  activities of class counsel and came to a reasoned judgment that

26  the settlement was not the product of fraud, collusion, or

1  overreaching).

2        One challenge in considering Adoma's objections is that she

3  appears not to have complied with the procedures for filing

4  objections with the court set forth in the settlement agreement and

5  in the notice of class action settlement. The latter provides:

> **IF YOU ARE SATISFIED WITH THE PROPOSED SETTLEMENT TERMS, YOU DO NOT NEED TO OBJECT OR APPEAR AT THE HEARING. IF YOU WOULD LIKE TO OBJECT OR APPEAR AT THE HEARING, YOU MUST COMPLY WITH THE PROCEDURE SET OUT IN THIS NOTICE.**
> Any settling Class Member may appear in person or through counsel (at his or her own expense) at the Final Approval Hearing and be heard on whether the settlement should be approved as fair, reasonable, and adequate to the Class. **Absent leave of the Court, however, no Settlement Class Member shall be heard at the Final Approval Hearing unless by the Claims Period Deadline he or she filed with the Court and postmarks and sends to the Parties, via First-Class mail, his or her written objection(s) stating any and all objections to the settlement agreement, including any supporting documents, and notice of intent to appear at the Final Approval Hearing.**

16  (ECF No. 139-3) (emphasis in original). It is unclear whether

17  Adoma, as a class representative, would have received this notice,

18  so she may not have been aware of the procedures for filing an

19  objection. Further, Adoma's letter states that she had purchased

20  airline tickets to attend the fairness hearing on its originally-

21  scheduled date of November 5, 2012, at which the court could have

22  granted her leave to voice objections. Finally, Adoma's letter

23  makes reference to a "first letter," which is not before the court,

24  but which may have indicated her intent to be present at the

25  November 5 hearing. Adoma concludes her letter by writing, "I am

26  of the opinion that we can have further discussion so that my side

1  can be heard or this documentation should be produced during the

2  hearing if appropriate. Please re-evaluate this case for fairness

3  and help me at least feel like I was heard."

4      In light of these circumstances and of <u>Ficalora</u>, the court

5  conducted an inquiry into Adoma's objections at the fairness

6  hearing held on December 17, 2012. Class counsel Michael Tracy

7  informed the court that after he sent Adoma the parties' Joint

8  Stipulation of Class Action Settlement and Release for review and

9  signature, she told him that she was retaining independent counsel

10 to review the agreement, which she ultimately signed. (See ECF

11 No. 129-3.)

12      The signed settlement agreement provides, first, that Adoma

13 is to receive a total of $25,000 in payments, and second, that

14 class counsel will seek up to 1/3 of the $4,000,000 settlement

15 amount in attorneys' fees.

16      The agreement also makes clear that by signing, Adoma was

17 consenting to be bound by its terms. It provides that "[t]he Class

18 Representatives will not object to the Settlement," and that "[t]he

19 Class Representatives, by signing this Stipulation, are bound by

20 the terms herein and further agree and [*sic*] not to object to any

21 terms of this Stipulation. Any such objection shall therefore be

22 void and of no force or effect." (Id. ¶¶ 7.2.7, 8.6.) If Adoma

23 believed, as she now claims, that class counsel had failed to keep

24 her properly informed about the proceedings or had barred her from

25 participating in settlement negotiations, she could have simply

26 declined to sign the agreement until her misgivings had been

1  assuaged.

2      Ultimately, there is nothing before the court to suggest that

3  the settlement agreement is anything but "fair, reasonable and

4  adequate to all concerned parties," Ficalora, 751 F.2d at 997.

5  Accordingly, the court will approve the settlement herein.

6      **D. Attorneys' Fees and Costs**

7      Class counsel also moves for approval of its fees and costs.

8  "In order to obtain fees justified on a common fund basis, the

9  class's lawyers must ordinarily petition the court for an award of

10 fees separate from and subsequent to settlement." Staton v. Boeing,

11 327 F.3d 938, 945 (9th.Cir. 2003).

12     Courts are obliged to ensure that the attorneys' fees awarded

13 in a class action settlement are reasonable, even if the parties

14 have already agreed on an amount. In re Bluetooth Headset Products

15 Liability Litigation, 654 F.3d 935, 941 (9th.Cir. 2011). When

16 attorneys' fees are to be paid from a common fund, as here, the

17 relationship between plaintiffs and their attorneys is deemed to

18 turn adversarial, and so "the district court must assume the role

19 of fiduciary for the class plaintiffs." In re Wash. Pub. Power

20 Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994).

21     In awarding attorneys' fees from a common fund, courts have

22 discretion to employ either the percentage-of-recovery method or

23 the lodestar method. Bluetooth, 654 F.3d at 942. Under the

24 percentage-of-recovery method, the prevailing attorneys are awarded

25 a percentage of the common fund recovered for the class. Id. In

26 applying this method, courts typically set a benchmark of 25% of

the fund as a reasonable fee award, and justify any increase or decrease from this amount based on circumstances in the record. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990). Under the lodestar method, the prevailing attorneys are awarded an amount calculated by multiplying the hours they reasonably expended on the litigation times their reasonable hourly rates. Staton v. Boeing Co., 327 F.3d 938, 965 (9th Cir. 2003). This amount may be increased or decreased by a multiplier that reflects any factors not subsumed within the calculation, such as "the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." Bluetooth, 654 F.3d at 942.

Even if the court chooses to apply the percentage-of-recovery method, calculation of the lodestar amount may be used as a cross-check to assess the reasonableness of the percentage award. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050-51 (9th Cir. 2002).

Class counsel seek attorneys' fees of $1,333,333, justifying this amount as 33.33% of the negotiated maximum settlement amount (the "common fund") of $4,000,000,[6] or (ii) a lodestar of $801,445

---

[6] The fact that only 50% of the maximum possible settlement will be paid out to claimants will not affect the court's inquiry as to the appropriate percentage to award. Ninth Circuit precedent focuses on the total award negotiated, rather than the amount actually collected by the class. See, e.g., Hanlon v. Chrysler Corp., 150 F.3d at 1029. Here, the parties have stipulated that if the court reduces any of the negotiated litigation expenses, the amount of the reduction will go to the settlement pool rather than reverting to defendant, thereby increasing the fund available to class members. (Settlement Agmt. ¶¶ 6.4.1, 7.3.2.)

1  multiplied by a 1.66 multiplier. Defendants have not objected to
2  the fees sought. Class counsel's justifications for seeking a fee
3  award in excess of the 25% benchmark or a lodestar multiplier of
4  1.66 are discussed below.

5        **1. Quality of representation**

6      Class counsel is correct in describing this as a heavily-
7  litigated case, as it involved a motion to dismiss or transfer the
8  action to the Central District of California; an order to show
9  cause as to the court's subject matter jurisdiction over
10 plaintiffs' state law claims; a contested motion for class
11 certification; a petition to the Ninth Circuit seeking permission
12 to appeal class certification; cross-motions for summary judgment;
13 and extensive discovery. (Mot. for Atty. Fees 1:7-12, 2:1-17, 2:24-
14 3:5.) The matter was litigated in multiple forums, as the court
15 transferred plaintiffs' FLSA claims to the Eastern District of
16 Pennsylvania, where they were subject to defendants' motion for
17 partial summary judgment. (Mot. for Atty Fees 4:17-23.)

18     This factor weighs in favor of some increase in the fee award,
19 as the typical wage and hour action does not involve multi-forum
20 litigation over the course of years. Moreover, plaintiffs prevailed
21 in nearly every motion.

22       **2. Benefit obtained for the class**

23     Class counsel has obtained positive results for the class, as
24 the court estimates that qualified claimants will receive average
25 payments of more than $2000 apiece. Nevertheless, while these
26 results are favorable, they are in no way remarkable or

1  extraordinary. By way of comparison, the plaintiffs in <u>Vizcaino</u>,

2  290 F.3d at 1043, secured a modification in the classification of

3  certain Microsoft temporary employees nationwide that yielded

4  benefits to those employees valued at over $100 million, obtained

5  a cash settlement of $96,885,000 for class members, and set an

6  important precedent in employment law. Class counsel was ultimately

7  awarded 28 percent of the common fund in fees. <u>Vizcaino</u> of course

8  involves an extraordinarily large settlement fund. A more apt

9  comparison may be <u>McKenzie v. Federal Express Corp.</u>, No. CV

10  10-02420 GAF, 2012 WL 2930201, 2012 U.S. Dist. LEXIS 103666

11  (C.D.Cal. Jul. 2, 2012) (Feess, J.), where class counsel secured

12  both an $8.25 million non-reversionary settlement on behalf of

13  hourly employees of Federal Express in California, and injunctive

14  relief that improved the clarity of pay stubs issued to all Federal

15  Express hourly employees nationally. Despite these impressive

16  results, the court refused to increase the benchmark rate of 25

17  percent in awarding attorney fees.

18      Class counsel cites several cases in which courts were willing

19  to grant common fund percentages of 33.33%, but other than

20  describing them as wage and hour cases, he does not apply the

21  reasoning in these cases to the facts in the present matter. His

22  first citation, to <u>Williams v. MGM-Pathe Communs. Co.</u>, 129 F.3d

23  1026 (9th Cir. 1997), is inapt. <u>Williams</u> merely holds that it is

24  an abuse of discretion to calculate class counsel's fees as a

25  percentage of the total claimed funds rather than the entire

26  settlement fund; the court did not reach the propriety of the

33.33% figure. His next two citations are to cases from the Southern District of New York, *i.e.*, district courts which do not apply Ninth Circuit standards for attorney fee awards. The final cases he cites, <u>Singer v. Becton Dickinson & Co.</u>, No. 08-CV-821-IEG, 2010 WL 2196104, 2010 U.S. Dist. LEXIS 53416 (S.D.Cal. June 1, 2010) (Gonzalez, J.) (awarding 33.33% of $1 million settlement fund) and <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 266 F.R.D. 482, 492 (E.D.Cal. 2010) (Wanger, J.) (awarding 33.33% of $300,000 settlement fund) involve smaller settlement funds, though admittedly, the litigation appears to have been far less complex in these cases than in the present matter.

Ultimately, the results for the class are not so exceptional as to in and of themselves justify an increase in the 25% benchmark.

### 3. Complexity and novelty of the issues presented

Class counsel states that he "has handled many class action cases, some [of which] have been much larger than this one and settled for large dollar amounts. However, none of them have come close to the complexity of this case in terms of the issues involved and the procedural hurdles." (Tracy Dec. in Supp. of Mot. for Atty. Fees ¶ 24.) He points to the novel issues in this matter, particularly the contention that the value of tuition benefits awarded to hourly employees should be included in the regular rate of pay on which overtime is computed. Plaintiffs were able to survive motions for partial summary judgment. (Mot. for Atty Fees 6:7-13.) The court also recognizes the complexities involved in

1  deciphering voluminous telephone records in order to determine
2  whether class members had received meal breaks and overtime
3  payments.

4      Accordingly, this factor weighs in favor of an increase in
5  the fee award.

### 4. Risk of nonpayment

7      Class counsel does not discuss the risk of nonpayment in his
8  motion, except to note that his firm has invested a substantial
9  number of hours in this case. For example, his billing records show
10 that he has put more than 1760 hours into this case. (Tracy Dec.
11 in Supp. of Mot. for Atty. Fees ¶ 18.) But there are no facts
12 before the court regarding the financial risks to the firm if this
13 case had been lost. As such, the court cannot conclude that the
14 risks exceeded those ordinarily faced by counsel who take cases on
15 contingency.

16     In light of the foregoing, the court believes that an award
17 of 29% of the common fund, or $1,160,000, is appropriate. It is
18 important that labor and employment attorneys be rewarded for
19 pursuing novel claims (so long as they are meritorious) and for
20 litigating these claims with tenacity, rather than cherry-picking
21 simple cases or settling difficult cases for small amounts.

### 5. Lodestar cross-check

23     Turning to the lodestar cross-check, the court must first
24 determine whether the hourly rates sought by counsel are
25 reasonable. "[T]he district court must determine a reasonable
26 hourly rate considering the experience, skill, and reputation of

33

1   the attorney requesting fees." <u>Chalmers v. City of Los Angeles</u>, 796

2   F.2d 1205, 1210 (9th Cir. 1986). This determination "is not made

3   by reference to rates actually charged by the prevailing party."

4   <u>Id.</u> Instead, the court should use the prevailing market rate in the

5   community for similar services of lawyers "of reasonably comparable

6   skill, experience, and reputation." <u>Id.</u> at 1210-11. The "relevant

7   legal community" in the lodestar calculation is generally the forum

8   in which the district court sits. "Affidavits of the plaintiff['s]

9   attorney and other attorneys regarding prevailing fees in the

10  community, and rate determinations in other cases, particularly

11  those setting a rate for the plaintiff['s] attorney, are

12  satisfactory evidence of the prevailing market rate." <u>United</u>

13  <u>Steelworkers of America v. Phelps Dodge Corp.</u>, 896 F.2d 403, 407

14  (9th Cir. 1990).

15       Class counsel has not filed affidavits from other attorneys

16  regarding prevailing fees in the Eastern District of California.

17  He has identified one case in the Eastern District, <u>Murillo v.</u>

18  <u>Pacific Gas & Electric</u>, No. 08-cv-01974-WBS-GGH, in which he was

19  awarded an hourly rate of $300/hour. Inspection of the docket in

20  that matter shows that this award was made on June 21, 2010.

21  (<u>Murillo</u>, ECF No. 47.)

22       Class counsel has also identified a case in which the Santa

23  Clara Superior Court awarded him fees of $425/hour, a case in which

24  the Los Angeles Superior Court awarded fees of $450/hour, and a

25  case in which the U.S. District Court for the Central District of

26  California awarded him fees of $450/hour. (Tracy Dec. in Support

1   of Mot. for Atty. Fees ¶¶ 14-16.) All of these matters were wage

2   and hour cases. (Id.) Class counsel also states that he has

3   represented defendants in wage and hour cases, billing them at a

4   rate of $425/hour, and that this rate is typical of what other

5   attorneys with equivalent experience charge for handling such

6   matters. (Id. ¶¶ 11, 12.)

7       Given that some two-and-a-half years have passed since the fee

8   award in Murillo and the hourly rate that he has subsequently

9   received in other cases in California, the court finds that

10  $425/hour is a reasonable hourly rate for class counsel's services.

11  To insist on awarding significantly-lower hourly rates in the

12  Eastern District than those in the other judicial districts in

13  California would discourage attorneys from bringing meritorious

14  lawsuits in this district.

15      The court has also examined the billing records submitted by

16  class counsel, and finds them to be reasonable. The lodestar amount

17  of $801,445 is therefore reasonable as well.

18      The $1,160,000 fee award calls for a 1.45 multiplier of the

19  lodestar amount. This is well within the range approved by the

20  Ninth Circuit. See Vizcaino, 290 F.3d at 1051 n.6 (finding that

21  multiples ranging from 1.0 - 4.0 are frequently awarded in common

22  fund cases, with slightly over half of the cases surveyed awarding

23  multiples in the 1.5 - 3.0 range).

24          **6. Reasonableness of fee arrangement**

25      The court concludes by evaluating the reasonableness of the

26  parties' fee arrangement in light of the Ninth Circuit's decision

35

1  in _Bluetooth_, 654 F.3d at 935. The _Bluetooth_ court identified three
2  factors which may indicate that an attorneys' fee settlement is not
3  fair, adequate, and reasonable:

4      (1) when class counsel receives a disproportionate
5      distribution of the settlement;
6      (2) when the parties negotiate a "clear sailing"
7      arrangement providing for the payment of attorneys' fees
8      separate and apart from class funds without objection by
9      the defendant (which carries the potential of enabling a
10     defendant to pay class counsel excessive fees and costs in
11     exchange for counsel accepting an unfair settlement); and
12     (3) when the parties arrange for fees not awarded to revert
13     to defendants rather than be added to the class fund.

14 _Id._ at 947.

15     Class counsel is not receiving a disproportionate distribution
16 of the settlement, whether in percentage terms or in absolute
17 terms. The Ninth Circuit benchmark in common fund cases is 25%;
18 here, class counsel is receiving 29%. The court estimates that the
19 settlement pool, particularly with the reduction in the fee award
20 to class counsel, will exceed the fee award of $1,160,000. These
21 small disparities are in sharp contrast to those in recent cases
22 like _Bluetooth_, where there was no monetary award to the class, but
23 the class counsel negotiated $800,000 in attorney fees, or _Harris_
24 _v. Vector Marketing Corp._, No. C-08-5198, 2011 WL 4831157, 2011
25 U.S. Dist. LEXIS 117927 (N.D.Cal. Oct. 12, 2011) (Chen, J.), where
26 the court disapproved an agreement that awarded class counsel $4

1  million, while the expected payout to the class was approximately
2  $1 million.

3          Turning to the second <u>Bluetooth</u> factor, the court, in
4  approving the settlement agreement, did approve a "clear sailing"
5  arrangement, as defendant agreed not to object to class counsel's
6  application for up to $1,333,333 in attorneys' fees. (Settlement
7  Agmt. ¶ 6.2.1.)

8          Nevertheless, the settlement agreement does not run afoul of
9  the third factor, as any fees disallowed by the court are allocated
10 to the settlement fund, rather than being retained by defendant.
11 (Settlement Agmt. ¶¶ 6.4.1, 7.3.2.) Given that qualified claimants
12 are eligible for 50% of the settlement fund, half of any reduction
13 in class counsel's fees will go to class members.

14         Accordingly, the court concludes that the negotiated agreement
15 as to attorneys' fees is fair, adequate, and reasonable.

16 **IV. Conclusion**

17         1.   Out of the identified Class Members who were notified,
18              none have objected to any aspect of the proposed
19              settlement. The reaction of the Class to the proposed
20              settlement strongly supports the conclusion that the
21              proposed Settlement is fair, reasonable, and adequate.

22         2.   The Settlement is HEREBY APPROVED in its entirety.

23         3.   The Settlement Fund shall be dispersed in accordance
24              with the Settlement Agreement as detailed in the Motion
25              for Certification of Settlement Class and Preliminary
26              Approval of Settlement, and Approval of Class Notice and

1        Settlement Administrator, granted on June 19, 2012.

2    4.    Representative Plaintiffs Diane Adoma and Michelle

3        Abbaszadeh are hereby awarded $5,000 each for their time

4        and effort in pursuing this litigation, and Ms. Adoma is

5        awarded an additional settlement payment of $20,000 for

6        her individual claims.

7    5.    Plaintiffs' application for attorneys' fees and costs

8        is granted in the amount of $1,160,000.00 in fees and

9        $25,000 in costs.

10    6.    As provided in the Joint Stipulation of Settlement and

11        Release, and except as to any rights that are created

12        by the settlement or this Order, all Settlement Class

13        Members who did not opt out of the Settlement have

14        released all Released Claims against the Company

15        Releasees as defined in the Joint Stipulation of

16        Settlement and Release.

17    7.    The Court hereby approves Defendants' LWDA payment of

18        $50,000 in accordance with the terms of the Joint

19        Stipulation of Settlement and Release.

20    8.    The Court hereby approves an award of $19,000 to

21        Simpluris, Inc., the Claims Administrator, for

22        settlement administration costs.

23    9.    The Court hereby enters Judgment approving the terms

24        of the Settlement.  This Order shall constitute a

25        Final Judgment for purposes of FRCP Rule 58.

26    10.    This case is hereby DISMISSED WITH PREJUDICE, with

1          each party to bear his, her, or its own costs, except

2          as set forth herein, and with this Court retaining

3          exclusive jurisdiction to enforce the Settlement

4          Agreement, including over disbursement of the

5          Settlement Fund.

6    IT IS SO ORDERED.

7    DATED:   December 18, 2012.

8

9

10
     LAWRENCE K. KARLTON
11   SENIOR JUDGE
     UNITED STATES DISTRICT COURT
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26